UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DE'ANTE J. SMITH,

      Plaintiff,

v.                                     Case No. 5:18-cv-192-TKW-HTC

A. WESTER, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter comes before the Court on Defendants' Motion for Summary Judgment (ECF Doc. 42). The matter was referred to the undersigned Magistrate Judge for preliminary screening and report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). Upon review and careful consideration of the motion, evidence, and response (ECF Doc. 48), the undersigned recommends the motion be GRANTED.

Plaintiff, an inmate of the Florida Department of Corrections ("FDOC"), currently incarcerated at Suwanee Correctional Institution ("Suwanee CI"), sues five correctional officers: Captain Wester, Officer Hatton, Sergeant Branch, Sergeant Johnson, and Officer Bourcier[1] for violating his Eighth Amendment rights in both

_____

[1] Plaintiff originally identified Defendant Bourcier as "J. Brovcher", however, the correct spelling of Defendant's name is "J. Bourcier." ECF Docs. 32 at 3; 42-5 at 1-2.

Case No. 5:18-cv-192-TKW-HTC

using excessive force on him and failing to protect him from the use of excessive force. Plaintiff's claims arise from three (3) use of force incidents that occurred on January 28, 2018, while he was at Apalachee Correctional Institution ("Apalachee CI"). ECF Doc. 9 at 2. Plaintiff also alleges an Eighth Amendment claim based on his placement on property restrictions on January 27, 2018. Additionally, Plaintiff alleges a claim of conspiracy against the Defendants. *Id.* at 11-14. Plaintiff sues all Defendants in their individual capacities. *Id.* at 1.

## I.    SUMMARY JUDGMENT STANDARD

To prevail on their motion for summary judgment, Defendants must show Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 248 (1986) (emphases omitted). An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the

outcome of the case. *See id.*; *accord Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998 (11th Cir. 1992).

Additionally, the Court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir. 1993). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.,* 750 F.2d 838, 841 (11th Cir. 1985)).

The Court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson,* 477 U.S. at 249–50 (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990) (quoting *Anderson,* 477 U.S. at 242). "[C]onclusory allegations without specific supporting facts have no probative value," and are legally insufficient to defeat summary judgment. *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'" and a court should grant summary

judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, (1986) (citation omitted).

## II.    DISCUSSION

Defendants move for summary judgment on Plaintiff's Eighth Amendment claims on the grounds that (1) the use of force was necessary and not excessive and (2) Plaintiff has failed to show he suffered more than a *de minimis* physical injury. Defendants argue they are entitled to judgment on Plaintiff's Eighth Amendment claim arising out of the conditions of his confinement because the conditions were not so extreme as to be unconstitutional.  Additionally, Defendants argue they are entitled to qualified immunity and Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine.  In support of Defendants' motion, they have submitted Declarations from the Defendants; Plaintiff's medical records; and video footage of the use of force incidents.

Plaintiff submitted a response to Defendants' motion, which argues the videos create a factual dispute; there were no justifications for Defendants to use force while Plaintiff was in restraints; there was no justification for Defendants to place Plaintiff on a 72-hour property restriction; and it is the jury's, not the Court's, province to weigh conflicting evidence.  In support of his response, Plaintiff submitted his own declaration.  Plaintiff's declaration sets forth an almost identical recitation of the events as contained in his amended complaint.

For the reasons set forth below, the undersigned agrees Defendants are entitled to judgment on all of Plaintiff's claims. First, the videos and medical records blatantly contradict Plaintiff's version of events such that no reasonable jury could find that Defendants used excessive force on Plaintiff. Second, the videos and medical records show that Plaintiff suffered no more than a *de minimis* injury. Third Plaintiff's 72-hour property restriction did not rise to a constitutional violation. Fourth, Plaintiff's conspiracy claims are barred by the intracorporate conspiracy doctrine.

## A.     Use Of Excessive Force

The Eighth Amendment requires that no cruel and unusual punishments be inflicted. U.S. Const. amend. VIII. In Eighth Amendment excessive force cases, the "core judicial inquiry" is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Bowden v. Stokely*, 576 F. App'x 951, 953 (11th Cir. 2014), quoting *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam) (quotation marks omitted) (concluding that a gratuitous beating by prison guards, even without injuries requiring medical attention, violated a prisoner's Eighth Amendment rights).

In determining whether the force was applied maliciously and sadistically to cause harm, courts consider the following factors: "a) the need for the application of

force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response." *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *Hudson v. McMillian*, 503 U.S. 1, 10 (1992); *Fennell v. Gilstrap,* 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam). When considering these factors, the courts "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Fennell* 559 F.3d at 1217 (quotation marks omitted).

As discussed in detail below, the video evidence "blatantly contradict[s]" Smith's version of events. *See Jones v. City of Cincinnati*, 736 F.3d 688, 692 (6th Cir. 2012), quoting *Scott v. Harris,* 550 U.S. 372, 380–82 (2007). Thus, the Court must "view[ ] the facts in the light depicted by the videotape" and cannot adopt the version of the facts offered by the Plaintiff. *See Jones*, 736 F.3d at 692; *Scott,* 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Viewing the facts as depicted in the videotapes leads the undersigned to conclude that no reasonable jury could find that excessive force was used.

1. <u>Use of force to return Plaintiff to his cell after psychological emergency declared</u>

In Plaintiff's amended complaint and declaration, Plaintiff alleges the following regarding the events that transpired on January 28, 2018.  On that day, Smith told Defendant Hatton he had a "psy emergency" and that he "wanted to kill [his] bunky and [himself]."  Defendant Hatton told him, "you know how it is were going to pull you out and put you back in nothing will be done for you."  "[T]hey pulled [Smith] out put [him] in leg restraints, handcuffs and a black box and waist chain and then escorted [him] to see K.O.P. Nurse Williams."  When he entered "the room", Smith saw Defendant Wester "looking at [him] very upset.  Ms. Williams asked [Smith] what was [his] psy problem Capt Wester told her [Smith was] on property restriction."  Smith told Nurse Williams he "wanted to kill [himself] and that [he] was having family problems and hearing voices and if they put [him] back in the room with [his] bunky [he] was going to kill him."  Defendant Wester said Smith was not going to do that and that he would "handle" Smith; he then stated he was "going to kill [Smith], that [Smith was] a fuck boy and a pussy nigga."

Defendant Wester "walked up to [Smith] and tr[ied] to push [him] off the medical bed" and Smith dropped backwards so he did not fall.  Nurse Williams left.  Then, Defendant Wester asked Smith what he was "going to do now no one [could] save [him]."  Smith said Defendant Wester "wasn't going to do nothing" to Smith, and Wester then "snatched [Smith] up and pushed [him] out the nurse station."

Although none of the events described above are captured in the videos provided, there are also no allegations of excessive force as it relates to those events. Defendants do submit, however, a mental health emergency protocol form completed by Nurse Williams, which contradicts Plaintiff's version of these events. In the form, Nurse Williams states that Plaintiff said he was going to kill himself, that he said he was placed on property restriction for no reason and that he says, "they keep saying they gonna kill me so I'm gonna get them." *Id.* She describes Plaintiff as "cursing at Capt. Wester, aggressive, I/M screaming and arguing with officers; threatening to beat Capt. up." ECF Doc. 42-10 at 7. She also notes that Plaintiff is "threatening staff" and "refuses" mental health assessment. *Id.* at 8. Plaintiff does not dispute the medical record or Nurse Williams' assessment in his declaration or response.

The first use of force occurs as Plaintiff is being transported from medical. Plaintiff alleges Defendant Wester "tried to force [Plaintiff] in the room with [his] bunky [but Smith] wouldn't go." Defendant Wester "began getting very disrespectful" so Plaintiff "cursed him back out." Defendant Hatton "began moving [Plaintiff] around to make it look like [he] was trying to attack Capt Wester." "They began to slam [Smith] on the floor and restrain [him] in full restraints flipping [him] on [his] stomach telling [sic] to stop resisting." Defendant Branch helped slam Plaintiff to the floor and both Defendant Branch and Defendant Hatton pressed

Smith's "pressure points telling [him] to stop resisting." Then, "Wester got behind [Plaintiff] and started grabbing [his] genital parts . . . so [he] would resist" and ordered Defendants Johnson and Bourcier to "pick [Smith] up and put [him] in [his] cell." ECF Doc. 9.

The videos provided by the Defendants, which include fixed wing and handheld cameras, paint an entirely different picture. Video (Exh. H-2) starts with Defendant Wester and two other officers, who Defendants represent in their declarations as Defendants Hatton and Branch, accompanying an extremely belligerent Smith back to his cell (presumably from medical). Officer Hatton is walking with Smith while Officers Wester and Branch are following closely behind. Smith can be seen and heard yelling profanities at the officers and saying that he is going to kill himself (00:18)[2]. The officers do not say anything back to him and there is no indication that Defendant Wester "began getting very disrespectful." In other words, contrary to Plaintiff's allegations it is clear from the video that Plaintiff's cursing at the officers was unsolicited. While Smith is being led to his cell by Hatton, he stops and turns around, yells at the officers, and motions back towards Officers Wester and Branch.

At that point, Officer Hatton uses force to edge Smith against the wall and attempt to hold him there with one hand by pushing on Smith's shoulder (00:16). A

---

[2] The parentheticals note the time elapsed on the video and not the time of day of the events.

very physical Smith is unphased and continues to yell at Defendants Wester and Branch. He ignores the Officers' orders for him to go against the wall and instead yells "whatcha gonna do?" (00:35). He also continues to push back against Officer Hatton, resulting in Defendant Branch needing to assist Hatton in keeping Smith edged against the wall.

When Wester gets Smith's cell door opened (1:15), Smith refuses to go inside the cell and instead sits on the ground (yelling at the top of his lungs at the officers the entire time). He also starts singing and swaying wildly on the ground (2:11). During this time, the officers are heard talking to him but none are yelling at him and their demeanor remains calm. Officer Branch can be seen simply leaning his hands on Smiths' shoulders to keep him seated (2:17).

Smith, while continuing to yell, starts to get up, pushing against Officers Hatton and Branch (2:46). At this point, Officer Wester goes over to Smith and helps Officers Branch and Hatton lay Smith on the ground and the three officers rest against Smith to hold him down (3:04). Contrary to Plaintiff's allegations, the video does not show Officer Hatton "moving [Plaintiff] around to make it look like [he] was trying to attack Capt Wester." The video does not show the officers "slam[ming]" Smith on the floor." It also does not show Defendant Wester "grabbing [Smith's] genital parts . . . so [he] would resist". To the contrary, Defendant Wester can be heard telling Smith to stop hollering (he has been hollering

the entire time) and in response Smith yells to Wester "you, shut the fuck up bitch."

(3:37).

Smith stopped moving while the officers were over him, however, he does not

stop yelling madly or cursing at the officers.  At this point, only Defendants Hatton

and Wester are holding Smith down.  Because the officers are bent over Smith and

their hands cannot be seen, the undersigned cannot tell whether the officers pressed

his "pressure points," as Smith alleges.  That said, Wester's shoulders and knees do

not move while he is trying to keep Smith down.  Moreover, even if the officers were

pressing down on Smith's pressure points to stop him from resisting, there is no

indication from the video, particularly given Smith's recalcitrant behavior, that such

force was "excessive."

Officers Hatton and Wester keep Smith on the ground until two more officers

arrive, who pick Smith up and put him inside the cell (09:40).  Plaintiff alleges in

his amended complaint and declaration that once inside the cell, Johnson and

Bourcier "dropped [him] out the air bottom bunk height letting [him] hit the floor

face first," and stepped out of the room to let Defendant Wester enter.  Defendant

Wester then kicked Plaintiff, "stood on top of [Plaintiff's] body with his feet on

[Plaintiff's] hands while in full restraints," put "his foot on [Smith's] neck causing

[him] to black out for a quick moment . . . [Plaintiff] then came back and started

screaming" and Defendant Wester "ran out and slammed the door leaving [Smith] in restraints."

The camera does not show what happens inside the cell, but Smith can still be heard yelling profanities at the officers. Thus, it is clear that Smith did not "black out." Moreover, the officers, including Wester, are in the cell for a total time of less than a minute. Also, as they exit the cell, Smith can be seen on the ground trying to block the door and Wester has to tell Smith to back up (10:34). This causes Wester and Hatton to re-enter the cell to contain Smith and Smith can be heard still cursing at the officers. The officers are finally able to leave the cell and close the door about 20 seconds later (10:53).

This, however, does not keep Smith from continuing to yell at the officers and curse at them through the door. At this point, Officer Wester begins talking on a handheld camera, held by Officer Branch, regarding the use of force incident, which is captured in video Exhibit H-1 (discussed below). Smith can be heard yelling through the door that he needs help because Wester is going to kill him while Wester is talking to the camera. Wester asks Smith to stop his disruptive behavior, but Smith does not stop. Smith can also be seen through a small window-like opening in the cell door walking around his cell and up to the opening.

2. Force used to remove restraints

The next alleged use of excessive force complained of by Smith occurred when Defendants Wester, Johnson, Bourcier and Hatton tried to remove his hand and waist restraints. Smith alleges in his amended complaint and declaration that Defendants Bourcier and Johnson, and "other officers came to get the handcuffs." They had a "black dog leash looking thing that they hooked to [Smith] telling [him] to give them the handcuffs which [he] was doing." They took turns pulling Plaintiff "telling [him] to stop resisting which [he] wasn't" and they "kept on pulling and snatching the chains causing pain to [Plaintiff's] body and leaving bruises on [him] until they got the restraints." ECF Doc. 9.

The removal of the restraints is captured in the video identified by Defendants as Exhibit H-1. Although the Officers' attempts to remove Smith's hand restraints do not start until 45 minutes into the video, the undersigned will discuss the entire video as the events that occurred in the first 44 minutes of the video are relevant to how Defendants responded to Smith.

As stated above, the video at H-1 starts with Wester relaying the initial use of force incident. Shortly after Wester is finished talking to the camera a nurse arrives to ask Smith about his injuries (1:12). Smith yells to the nurse that his right hand hurts where he broke it before, his right ankle hurts and the upper part of his arm hurts (1:22). The nurse and Wester than leave the cell a few minutes later and Wester

asks Officer Branch to continue filming and monitoring Smith. Officer Branch does so and for the next thirty (30) minutes, Smith can be heard yelling "I need help", singing at times and standing in front of the door. During this time, Smith can also be seen putting wet toilet paper on the clear window-like opening into the cell to prevent anyone from seeing inside. Officer Branch tells him multiple times to stop his disruptive behavior and move the cover from the window, but Smith does not comply.

At 33:15 on the video, Wester returns to the cell and asks Smith if he wants to take off his restrains. Smith continues to yell at Wester as Wester is talking to him through the window opening. Wester continues to ask Wester if he would like to give up his hand restrains. Smith yells louder and louder and cusses at Wester. He tells Wester that Wester will not be able to do anything to him when he is out of his handcuffs because he saw Wester could not do anything to him when he was in his handcuffs. At 36:21, Smith is heard yelling once again at the top of his lungs "do it, do it m—f--", and then singing and yelling "back that a—up" through the cell opening when Wester walks away. At 39:34, Smith says he's ready to take the cuffs off. He says he'd rather die fighting for his life. Smith can be seen this entire time standing in front of the cell window opening.

Wester returns to the cell at 42:20 and directs Smith to turn around and kneel down so the leg restraints can come off. At 44:00, two officers take the leg restraints

off without incident.  At 44:35, Smith says that he and Wester are married and he will "f – the s- out of Wester" and that Wester is his "personal b-."

Around 44:55, two officers begin trying to take Smith's hand restraints off through the use of a snatch strap.[3]  They ask Smith to put his hands through a cuffing portal in the door cell so that they can get to his cuffs.  Smith does not cooperate and instead makes it very difficult for the officers to remove the restraints.  Despite their orders for him to stop resisting, Smith continues to pull at the chain that is being used to remove the restraints and tries to swing it.  The officer can be seen continuing to work through the cuffing portal in the door to get the chains off as they tell him to quit snatching and to quit moving.  The officers, including Wester, tell Smith that if he would quit resisting, they could get the restraints off.  After trying for more than ten (10) minutes officers give up and close the cuffing portal (57:00).

Plaintiff's allegations regarding this incident are blatantly contrary to the video.  The video shows that it is Plaintiff, not the officers, who is snatching at the snap trap and pulling at it.  It is Plaintiff who is making it difficult for officers to remove the cuffs.  Moreover, contrary to Plaintiff's allegations, it is the officers who can be seen trying to help Plaintiff by removing his cuffs.

---

[3] Defendants explain in their declarations that the snatch strap was used to prevent Smith from gaining access to the restraint chain once the belly chain lock was removed.  ECF Doc. 42-2, 42-4 and 42-5.  The snatch strap appears to be what Plaintiff describes as a "black dog leash looking thing."

Additionally, after the officers quit trying to remove the cuffs, Smith continues to yell and sing, jump up and down in his cell, and hit the door, even though Wester tells him to stop. At 58:50, Smith says "I'm going out with a bang, they gonna kill me." Smith's rantings continue until 1:02:30. Wester brings a nurse back at 1:02:40 and Smith says he is going to deal with the pain and "sue the s- out of ya'll a-." Smith also complains about not being able to breath because of the restraints, which are also around his waist, but at the same time, he starts singing the song "No Air." The nurse leaves around 1:03:37, and the camera stays focused on the cell. Smith can be heard yelling nonsense the entire time.

At 1:11:08 Wester returns to read the FDOC policy on the use of chemical agents. He tells Smith he has one more opportunity to comply with the order and to stop his disruptive behavior before chemical agents are used. He tells Smith the order will not be repeated. Wester asks Smith if he understands the order, and Smith yells, initially "I'm ready to take these handcuffs off" and then yells, "yes sir." Despite his acknowledgment that he understands the order, Smith tells the officers "ya'll look cute in those uniforms." Wester tells Smith they are going take the restraints off if he does exactly what they say. Nonetheless, Smith continues to holler until he is told again by Wester to stop being disruptive.

While officers again try to take the restraints off, Smith can be heard yelling "back that a—up" and saying other things that did not come out clearly on the video.

However, Wester can be heard telling Smith to close his mouth.  Officers finish

taking the restraints off at 1:14:07.  Wester tells Smith to go to his bunk and sit down.

Smith, however, does not comply and can be seen through the cell opening standing

up still mouthing off to Wester.  Officer Wester reminds Smith that he has been

given his final order and is still not complying.  Wester then waits outside the cell

for four minutes, at which time Wester tells the camera that it is 2:29 P.M. and Smith

has complied with the order (1:18:00).

### 3. Use of chemical agents

The next alleged use of excessive force complained of by Smith in his

amended complaint and declaration occurred when chemical agents were sprayed

into the cell.  Smith alleges that Smith's cellmate Manning looked at Smith's "hand

and arms seeing that [he] needed medical treatment which they were not trying to

give [him] [s]o [Manning] began to kick the door."  Defendant Wester asked if Smith

was doing the kicking and "they were talking about spraying [Smith and Manning,

so Manning] flooded the room."  Wester told Manning to get out of the way so they

could spray Smith, but Manning "didn't want them to harm [Smith] so he reached

out to stop them and they still sprayed [Smith and Manning]."  Plaintiff alleges "all

of this is on audio and video."  ECF Doc. 9 at 10.

The use of chemical agents is captured on the video, identified as Exhibit I-1

to the Defendants' motion for summary judgment.  At the beginning of the video,

Wester tells the camera that Smith was given his final order 2 ½ hours ago and that about 25 minutes ago Smith caused a disturbance by yelling and kicking his cell. He further states that Officer Hatton tried to counsel him but to no avail. Officer Johnson is the officer who will be applying the chemical agents and Wester tells Officer Johnson to only use the amount of force necessary and he is only to apply three (3) one-second bursts.

At 1:34 into the video, Wester approaches Smith's cell and tells Smith's roommate Manning to step away from the cuffing portal and move to the side. At 2:30, Officer Johnson sprays three (3) bursts of chemical agents into the cell and Wester closes the cuffing portal 10 second later. About 2 ½ minutes later, the officers open the cell and get both Smith and Manning out of the cell. Officers escort Smith and Manning down the hallways to the shower areas.

Once in the showers, Smith continues to berate and yell at Wester and the officers while he is showering. Nonetheless, Wester brings Smith fresh clothes and Smith showers for over 20 minutes. Wester tells Smith to put his clothes back on. Smith refuses and Manning, his roommate has to tell him to put them on. Wester and the officers then escort both Manning and Smith to medical. As Manning is being seen by the nurse, Smith is waiting outside, looks at the camera and starts yelling and cursing at the officers once again. He makes fun of Wester while Wester is trying to talk to him (32:26). He makes fun of someone's cough. He tells Wester

they are married (35:00) and calls Wester a "stupid m—f—" (35:35). He appears to be unphased and undaunted by the chemical spray. After Smith is examined by medical, the officers return Smith and Manning to a new, clean cell.

Although there is no video footage of the disturbance that resulted in the chemical spray, there is no dispute that whether it was Smith or Manning (as Smith says), someone in their cell was kicking the door. Based on the events that started at 12:58 PM that day, and lasted over an hour, it is not difficult to see how officers believed the disturbance was caused by Smith as Manning had not caused any disruption up to that point. Additionally, earlier in the day, Smith had been kicking the door and was told to stop. Indeed, even after the chemical agent was used, it was Smith and not Manning who continued to curse at, yell at, and belittle officers. Therefore, given that Smith had been given a final order and that Smith was recalcitrant, belligerent and combative for over an hour that day, the undersigned cannot find the use of chemical agents to be an excessive use of force.

Moreover, the undersigned finds based on the totality of the video evidence there was a need for Defendants to use force in all three instances described above. The undersigned finds that the relationship between the need and the amount of force that was used was not excessive. The undersigned also finds, as will be discussed below, that the extent of the injury inflicted upon Smith was minimal and that Smith's behavior was clearly a threat to the safety of the officers. Finally, the

undersigned finds that Defendants made considerable efforts to temper the severity of a forceful response in each instance.

In the first instance, Defendants did little more than use their bodies to try to restrain a very physical Smith and get him back to his cell. In the second instance, Defendants were trying to remove Smith's restraints from him. And, in the third instance, Defendants sprayed three (3) one second spurts of chemical agent into the cell and took Smith out of the cell about 2 ½ minutes later. Defendants then immediately transported Smith to the shower, where he was allowed to shower for over 20 minutes, and took him to medical before returning him to a clean cell with clean clothes. Moreover, Defendants attempted to calm Smith for approximately four (4) hours before using chemical agents on him.

Thus, despite Smith's assertions to the contrary, the videos show that Defendants acted in an effort to maintain discipline and not maliciously and sadistically for the purpose of causing harm. *See Whitley*, 475 U.S. at 320-21 ("whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm'"). The undersigned finds no reasonable jury could conclude, based on the video evidence, that Defendants acted maliciously or sadistically or used excessive force such as would be necessary for Smith to be entitled to relief under the Eighth

Amendment. *See Scott*, 550 U.S. at 380–81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *Coulston v. Glunt,* 665 F. App'x 128, 132 (3d Cir. 2016) (affirming grant of judgment in favor of defendant on excessive force claim where "despite [plaintiff]'s assertions to the contrary, the video showed that [defendant] acted in an effort to maintain discipline").

The video shows a very combative and physical Smith taking officers to task. Plaintiff was given several chances to cease his disruptive behavior and comply with the Defendants' orders and was also given a final warning prior to the use of chemical spray. Despite Defendants' attempts to avoid using force, Plaintiff shouted expletives at the officers and was otherwise extremely hostile towards the officers. "Under these circumstances, there is no question that the officers had a significant need to bring Plaintiff under control." *See Burke v. Brown,* 653 F. App'x 683, 696 (11th Cir. 2016) (affirming judgment for defendant and finding there was no question officers "had a significant need to bring Plaintiff under control," where evidence showed "Plaintiff was aware that a use-of-force team had been assembled and was warned that pepper spray would be used if he did not comply with officers' orders. In response, Plaintiff shouted expletives at the officers and was otherwise hostile."), citing *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990) ("Prison

guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding."). As in *Burke*, the Defendants in this case, "went to great lengths to temper the severity of the force used, and indeed sought to avoid the use of force altogether. Accordingly, no reasonable jury could find that [Defendants] ordered the use of pepper spray 'maliciously and sadistically to cause harm' to Plaintiff rather than to restore discipline." *See id.*

Indeed, despite Smith's caustic behavior the videos show that in each instance no more than a *de minimis* use of force occurred. First, the type of force allegedly used: (1) holding Plaintiff against a wall and restraining him with body weight; (2) using a snatch strap to remove hand and waist restraints; and (3) spraying 3 one-second spurts of chemical agent into a cell after giving an inmate a final order are "not of a sort repugnant to the conscience of mankind." *See Smith v. Sec'y, Dep't. of Corr.*, 524 F. App'x 511, 514 (11th Cir. 2013), citing *Hudson v. McMillian*, 503 U.S. 1, 10 (1992). Second, Smith did not sustain a more than *de minimis* injury (*see* Section I.D. below). *See Smith*, 524 F. App'x at 513-14 (affirming summary judgment in favor of defendant on finding of lack of a *de minimis* use of force where "record supports the finding that [plaintiff] suffered only the minor injury of facial swelling as a result of the incident"); *Vicks v. Knight*, 380 F. App'x 847, 852 (11th Cir. 2010) (affirming judgment on excessive force claim because based on the

evidence presented, "a reasonable factfinder could not believe that [plaintiff] suffered any injury, and thus could not reasonably infer that [defendant] used anything more than a *de minimis* amount of force").

### B.    Failure To Intervene

"[A]n officer can be liable for failing to intervene when another officer uses excessive force." *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000); *see Dukes v. Miami–Dade Cty.*, 232 F. App'x. 907, 913 (11th Cir. 2007) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.") (*citing Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)).  The officer is only liable if the officer "was in a position to intervene." *Williams v. Scott*, 433 F. App'x 801, 805 (11th Cir. 2011) ("Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence.") (*citing Ensley*, 142 F.3d at 1407).

Defendants are entitled to judgment on this claim for two reasons.  First, Plaintiff alleges that the same Defendants who used excessive force against him also failed to protect him.  However, Defendants cannot be liable for both using excessive force and failing to protect.  Second, because the undersigned finds that no excessive force was used, Defendants had no constitutional obligation to intervene.  *See*

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (plaintiff must demonstrate that he was under a substantial risk of serious harm, that the defendants were aware of facts from which they could draw that inference, and that the defendants did draw that inference); *Bash v.* Patrick, 608 F.Supp. 2d 1285, 1297, n. 7 (M.D. Ala. 2009) (derivative theory of failure to protect "cannot support liability when there was no underlying use of excessive force"), citing *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985).

### C.    Conditions Of Confinement

Plaintiff also alleges his Eighth Amendment rights were violated when he was placed "on property restriction and management meal which was not signed off by the warden or a chief officer." ECF Doc. 9 at 8-9. He alleges he was placed on "property restriction without any mat, sheets, blankets and no clothes" for 72 hours. *Id.* at 12. During his property restriction, Plaintiff states he was "forced to sleep [on] iron and steel in a cold cell." *Id.* at 15. Additionally, Plaintiff claims he was deprived of his meals for seven days and placed on a "special management meal" instead. *Id.* at 13. Even assuming these allegations are true, they fail to state a claim under the Eighth Amendment.

Prison conditions rise to the level of an Eighth Amendment violation only when they "involve the wanton and unnecessary infliction of pain." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). To demonstrate an Eighth

Amendment violation based on conditions of confinement a prisoner must show: (1) the condition he or she complains of is sufficiently serious to violate the Eighth Amendment and (2) the defendant prison officials acted with a sufficiently culpable state of mind with regard to the condition. *Id.* at 1289. To establish prong one, a prisoner must show the condition is "extreme" and poses "an unreasonable risk of serious damage to his future health or safety." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). To establish prong two, a prisoner must demonstrate that an official "knows of and disregards an excessive risk to inmate health or safety." *Chandler*, 379 F.3d at 1289-1290 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

As an initial matter, Plaintiff states Defendant Wester asked Sergeant Hughes "what he wanted to do with [Smith]." ECF doc. 9 at 8. Hughes said to put Smith "on property restriction," so Smith "was placed on property restriction." *Id.* It appears that Hughes, a non-defendant, made the decision to place Smith on property restriction and to change his diet to management meals. Thus, Plaintiff has not shown that any of the named Defendants were responsible for the conditions of his confinement. Regardless, even if he had alleged any facts showing that the named Defendants were responsible for the conditions of his confinement, his Eighth Amendment claim would nonetheless fail.

1. <u>Food deprivation</u>

According to Plaintiff, Defendants forced him to eat "special management meal[s]" for seven days instead of his regular meals. ECF Doc. 42 at 15. Defendants contend Plaintiff missed just one meal. Even taking Plaintiff's allegation as true, requiring Plaintiff to eat "special management meals for seven days" does not rise to the level of an "extreme" deprivation posing "a serious risk to [Plaintiff's] future health." *Chandler*, 379 F.3d at 1289; *see Novak v. Beto*, 453 F.2d 661, 665, 668 (5th Cir. 1971) (no Eighth Amendment violation when prisoner was fed two slices of bread per day, unlimited water, and a full meal every three days, and that restrictive diet did not extend beyond fifteen days); *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008) (no Eighth Amendment violation based on prison officials' decision to deprive Plaintiff of five meals per week).

Plaintiff is entitled to meals "containing sufficient nutritional value to preserve health." *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977). However, Plaintiff does not allege the meals he received were nutritionally inadequate, instead, he apparently disliked the management meals. Plaintiff cannot state a claim based on his preference for a different meal. *Meddler v. Buss*, No. 4:10CV532-SPM/WCS, 2011 WL 7143584, at *4 (N.D. Fla. Dec. 5, 2011) ("prison food need not be 'tasty or aesthetically pleasing'" (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir.

1993)), *report and recommendation adopted*, No. 4:10CV532-SPM/WCS, 2012 WL 360090 (N.D. Fla. Feb. 2, 2012)).  Federal courts should not be "concerned with a prison menu to which prisoners believe they are entitled.  These involve matters of internal prison administration." *Id.* (quoting *Tunnel v. Robinson*, 486 F.Supp. 1265, 1269 (W.D. Pa. 1980)).

    2.  Property restrictions

    Plaintiff claims he was placed on "property restriction without any mat, sheets, blankets and no clothes" for seventy-two (72) hours and that he was "forced to sleep [on] iron and steel in a cold cell." ECF Doc. 9 at 12, 15.  Plaintiff further claims Wester, Hatton, and Bourcier placed him in property restriction with "malicious and sadistic intent to injure Plaintiff." *Id.* at 12, 14.  Plaintiff claims he sustained "physical and emotional injuries" from the conditions he endured on property restriction. *Id.* at 15.  Even assuming these allegations to be true, Plaintiff has not alleged a constitutional violation.

    Being placed in a cold cell for a 72-hour period does not constitute conditions so "extreme" as to constitute an Eighth Amendment violation.  *See e.g., Thomas v. Rodgers*, No. 3:13-CV-1052-J-32PDB, 2013 WL 6017327, at *1, 4 (M.D. Fla. Nov. 13, 2013) (no violation where plaintiff was confined in a cell for thirty-six hours that was "uncomfortably cold" with only his boxers on and he suffered pain from laying on the "steel bunk" and "cell floor"); *King v. Henry*, No. 5:09-CV-365 MCR EMT,

2010 WL 4386539, at *3, 7 (N.D. Fla. Sept. 24, 2010) (dismissing inmate's claim where he complained of sleep loss, chills, shaking, severe discomfort, and severe neck and shoulder pain from exposure to temperatures ranging from 30 to 60 degrees over forty-eight day period), *report and recommendation adopted*, No. 5:09-CV-365 MCR EMT, 2010 WL 4386537 (N.D. Fla. Oct. 29, 2010); *Wineston v. Pack*, No. 4:06CV438-RH/AK, 2009 WL 3126252, at *2, 12 (N.D. Fla. Sept. 24, 2009) (no constitutional deprivation when prisoner was denied clothes and bedding for twenty-four hours and temperature dropped to 58 degrees).

### D.   Plaintiff Has Not Suffered More Than A *De Minimis* Physical Injury

It is well settled in the Eleventh Circuit that an incarcerated individual cannot recover compensatory or punitive damages for a constitutional violation unless he can demonstrate a more than *de minimis* physical injury. *See Brooks v. Warden*, 800 F.3d 1295, 1307 (11th Cir. 2015) (collecting cases construing § 1997e(e) of the PLRA). Where the physical injury is *de minimis* or, in some circumstances, where there is no physical injury, the plaintiff can only recover nominal damages. *Id*. Although the Eleventh Circuit has not adopted a definition of "*de minimis*," the court has acknowledged an injury is more than *de minimis* if it is "an observable or diagnosable medical condition requiring treatment by a medical care professional". *Thompson v. Sec'y, Fla. Dep't of Corrections*, 551 F. App'x 555, 557 n.3 (11th Cir. 2014) (quoting *Luong v. Hatt*, 979 F.Supp. 481 (N.D. Tex. 1997)).

Plaintiff alleges in his complaint that during the use of force his hands "started to go numb" and that as a result of the use of force "his wrist was swollen" and his hand was in "great pain."  In grievances attached to his amended complaint, Plaintiff complains of right hand and upper right arm pain and contends his right hand was "severely swollen" and cut and that he has "cuts, bruises [and] swelling."  He also complained of burning to his eyes, penis, and mouth.

These allegations, even taken as true, do not show that Plaintiff suffered a more than *de minimis* physical injury.  *See e.g., Nolin v. Isbell,* 207 F.3d 1253, 1258 n. 4 (11th Cir. 2000) (bruises received during an arrest were a *de minimis* injury); *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997) (finding that a bruised ear which lasted for three days was a *de minimis* injury); *McDonald v. Neal,* 2013 WL 6410402 (S.D. Ala. Dec. 9, 2013) (finding the allegations of an officer poking the plaintiff with a nightstick, slapping him two to three times across the face, and shoving him into the wall did not present a physical injury); *Mobley v. Grasco,* 2011 U.S. Dist. LEXIS 81136, *6–8, 2011 WL 3163159 (N.D. Fla. July 1, 2011) (finding the claim of "pain and suffering" did not allege an injury); *In re Bayside Prison Litigation,* 2010 WL 4916716 (D. N.J. November 18, 2010) (finding that the inmate's pain and swelling of the pinky finger for two days after the officer hit his left hand with a stick was a *de minimis* injury inasmuch as the swelling was only for

a couple of days, and there was no lasting pain or physical distress or restriction even though the pinky finger was slightly deformed).

Moreover, the medical evidence in the record shows that Plaintiff did not suffer more than a *de minimis* injury. In addition to the video evidence, which shows no observable physical injuries, the medical personnel who examined Plaintiff immediately after the use of force incident did not identify any physical injury greater than mild swelling on his hand. As stated above, Plaintiff does not dispute the medical records or the nurses' assessments of his injuries in his response or declaration.

As shown in video H-1, a nurse is called to examine Plaintiff after the first use of force incident. She, however, was unable to examine Plaintiff because he was "disorderly" and "refusing to comply." ECF Doc. 42-10 at 3. The second nurse to examine Plaintiff that day, did so around 2:10, after the second use of force incident. Nurse Brown wrote that Plaintiff complained of right arm and left arm pain and that he could not breath. ECF Doc. 42-10 at 4. However, the nurse observed him "singing and yelling" and without "visible signs of injuries." *Id.*[4]

Plaintiff was also examined after the use of chemical agents. In Nurse Prescott's assessment, she described Plaintiff's injures as "mild swelling noted to

---

[4] The medical records also include another assessment conducted on January 28th that does not include a time. In that assessment, Nurse Williams describes Plaintiff's condition: "no injuries noted." ECF Doc. 42-10 at 5.

top of right hand.  No lacerations noted.  No draining or redness."  ECF Doc. 42-10 at 6.    Additionally, Plaintiff was examined the following morning.    In that assessment, the nurse wrote that Plaintiff "acted hurt when being assessed by medical" but that there was "no swelling, no discoloration noted."  Plaintiff had "full ROM [in] both arms" and was in "no acute distress."  ECF Doc. 42-10 at 2.

Thus, even if he could prove a constitutional violation based on the use of excessive force, for failure to protect or based on the conditions of his confinement, Plaintiff would be entitled to no more than nominal damages of $1.00, if he had requested such relief.  Plaintiff, however, failed to seek nominal damages in his amended complaint.  Instead, Plaintiff requests specific monetary relief against each defendant as follows:  $480,000 from Wester; $320,000 from Hatton; $200,000 from Johnson; $480,000 from Bourcier; and $240,000 from Branch.

In the absence of a request for nominal damages or for "other relief", this action should be dismissed because Plaintiff would not be entitled to any recovery even if he could show any constitutional violation.  *See Sears v. Rabion,* 97 F. App'x 906 (11th Cir.2004) (affirming district court's *sua sponte* dismissal of complaint under § 1997e(e), noting that plaintiff's complaint could not be liberally construed as requesting nominal damages, because he specifically requested compensatory and punitive damages); *Qualls v. Santa Rosa Cnty. Jail,* Case No. 3:10cv54/MCR/MD, 2010 WL 785646, at *3 n. 1 (N.D.Fla. Mar.4, 2010) (dismissing the plaintiff's

complaint as it "cannot be liberally construed as requesting nominal damages, because he specifically requested only $250,000 in compensatory and/or punitive damages"); *Harrison v. Myers,* Case No. 10–0566–KD–N, 2011 WL 3204372, at *7 (S.D.Ala. July 13, 2011) (prisoner's request of $2,500 was not for nominal damages inasmuch as nominal damages implies a mere token or trifling).

### E.    Defendants Are Entitled To Qualified Immunity

As stated above, Defendants also move for judgment based on qualified immunity.    "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).    "'To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority.'"    *Caldwell*, 748 F.3d at 1098 (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233–34 (11th Cir. 2003)).

Where there is no dispute that a defendant was exercising a discretionary function, the plaintiff bears the burden of showing that Defendants are not entitled to qualified immunity. *Brooks*, 800 F.3d at 1306; *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).    To meet this burden, plaintiff must prove that (1) Defendants

violated a constitutional right and (2) this right was clearly established at the time of the alleged violation. *Caldwell*, 748 F.3d at 1099.

Because the undersigned finds that Defendants did not violate any of Plaintiff's constitutional rights, the undersigned finds it unnecessary to proceed to the "clearly established" prong on any of Plaintiff's claims. *See Dalrymple*, 334 F.3d at 997 ("Because we find no constitutional violation ..., we need not address whether the constitutional rights at issue were clearly established.").

### F.     Conspiracy Claim

Finally, Plaintiff alleges Defendants conspired with one another to violate his Eighth Amendment rights. He alleges Wester ordered Johnson and Bourcier to pick him up and put him in his cell. ECF Doc. 9 at 10. Plaintiff also alleges "they" (Defendants) talked about spraying Manning and Plaintiff and that Wester stated, "Smith's in the corner, spray the corner." *Id.* Plaintiff claims Wester conspired with "his low ranking officer to gas Plaintiff" in violation of the Eighth Amendment and 42 U.S.C. § 1853 (3); Wester, Hatton, and Bourcier conspired to put Plaintiff on property restriction; and Wester, Hatton, and Bourcier conspired to place Plaintiff on "special management meal[s]"; *Id.* at 12, 13, 14.

To state a claim for conspiracy under section 1983, a plaintiff must (1) prove the parties had a "meeting of the minds" or reached an understanding to violate the plaintiff's rights and (2) prove an actionable wrong in support of the conspiracy.

*Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.,* 956 F.2d 1112, 1122 (11th Cir.1992). "[T]he linchpin for conspiracy is agreement, which presupposes communication . . . ." *Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1346 (S.D. Fla. 2012)(quoting *Bailey*, 956 F.2d at 1122). The first element, however, cannot be met where the alleged co-conspirators are employees of the same entity. This is true with regard to a claim for conspiracy under § 1983.

"The intracorporate conspiracy doctrine bars conspiracy claims against . . . government actors accused of conspiring together within an organization . . . ." *Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010), *aff'd,* 566 U.S. 356 (2012). Under the doctrine, "employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves." *See Dickerson v. Alachua County Com'n,* 200 F. 3d 761, 767 (11th Cir. 2000) ("The reasoning behind the intracorporate conspiracy doctrine is that it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself."). This doctrine applies to private corporations as well as to public, government entities. *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1262-63 (11th Cir. 2010) (applying intracorporate conspiracy doctrine to conspiracy claims against police officers); *Claudio v. Crews*, No. 5:13-cv-00345-MP-EMT, 2014 WL 1758106, at *6 (N.D. Fla. May 1, 2014) (applying intracorporate conspiracy doctrine to FDOC employees).

The doctrine prohibits conspiracy claims when: (1) all defendants are employees of the same entity and (2) the defendants are being sued for employment-related activities. *Grider*, 618 F.3d at 1261; *Claudio*, No. 5:13-cv-00345-MP-EMT, 2014 WL 1758106, at *6. Additionally, the intracorporate conspiracy doctrine prohibits a claim against law enforcement officers for conspiracy in their individual capacities, as well as claims that do not seek to hold the corporate entity itself liable for its agent's activities. *See Watson v. Edelen*, 76 F.Supp. 1332, 1371 n. 16 (N.D. Fla. 2015). Because all Defendants were employees of the FDOC on January 27 and January 28, 2018, and there is also no dispute that all Defendants are sued for conduct they carried out as employees of the FDOC, the undersigned respectfully recommends Plaintiff's claim for conspiracy against Defendants be dismissed under the intracorporate doctrine.

## III. CONCLUSION

As set forth above, Plaintiff's Eighth Amendment claims fail as to all Defendants because (1) his allegations of excessive force are blatantly contradicted by the video evidence; (2) he has not shown that his 72-hour property restriction rose to the level of a constitutional violation; (3) he has not suffered a more than *de minimis* physical injury; and (4) Defendants are entitled to qualified immunity. Additionally, because he has sought only compensatory damages in a set amount, he is not entitled to any relief. Moreover, his conspiracy claim is barred by the

intracorporate doctrine. Thus, the undersigned finds that Defendants are entitled to judgment on all claims.

Accordingly, it is respectfully recommended that,

1.    Defendants' Motion for Summary Judgment be GRANTED on all claims.

2.    The clerk be directed to correct the spelling of the name for Defendant "J. Brovcher" as "J. Bourcier".

3.    The clerk be directed to close this file.

At Pensacola, Florida, this 12th day of March, 2020.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon the magistrate judge and all other parties. A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.